1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10

11 | ROBERTA LONA,

12 |                                    Plaintiff,

13 |        vs.

14 | PRUDENTIAL INSURANCE COMPANY
OF AMERICA; and DOES 1 through 10,
15 | inclusive,

16 |                                    Defendant.

CASE NO. 07-CV-1276-IEG (CAB)

**MEMORANDUM OF DECISION
AND ORDER**

17

## INTRODUCTION

18        This is an action arising under § 1132(a)(1)(B) of the Employee Retirement Income Security

19 Act of 1974 ("ERISA").  Plaintiff Roberta Lona's claim centers on a long term disability insurance

20 policy, Group Plan Number G-3100 ("Policy" or "the Policy"), which defendant Prudential Insurance

21 Company of America ("Prudential" or "defendant") issued to plaintiff's former employer, Xerox

22 Corporation ("Xerox"). Plaintiff made a claim under the Policy which defendant identified as Claim

23 Number 10739885 ("Claim" or "the Claim").  Plaintiff received benefit payments under Xerox's

24 self-insured Long-Term Disability Plan from December 27, 2002 until May 30, 2005.  Once plaintiff

25 exhausted the Xerox Plan benefits, she received benefits under the Prudential Policy.  She collected

26 those benefits from May 30, 2005 until January 31, 2006, when Prudential terminated them.

27        On June 12, 2007, plaintiff filed a complaint alleging defendant breached its "contractual

28 and/or fiduciary obligations" under the Policy and violated 29 U.S.C. § 1132 by failing to honor the

Claim, as a result of the wrongful termination of her long-term disability benefits.  Plaintiff seeks judgment against defendant for: (1) lost benefits under the Policy; (2) prejudgment interest on the withheld benefits; and (3) reasonable expenses incurred, including attorney fees and costs.

The matter came before the Court for trial without a jury on January 15 and 16, 2009.  John W. Tower, Esq. of the Law Office of John W. Tower appeared on plaintiff's behalf, and Stanley A. Calvert of Wilson, Elser, Moskowitz, Edelman, and Dicker appeared for defendant.    This memorandum decision constitutes the Court's findings of fact[1] and conclusions of law.

## JURISDICTION

This Court has jurisdiction pursuant to 29 U.S.C. § 1132 (e)(1), providing that the district courts of the United States have jurisdiction over civil actions brought under § 1132(a)(1)(B) of ERISA by a plan participant.  Venue is invoked in this Court under 29 U.S.C. § 1132 (e)(2), providing that an ERISA action may be brought in the district where the plan is administered or where the breach took place.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff is a fifty-five (55) year-old woman with three children.  She earned a Bachelor of Arts degree in Sociology from Northwestern University in 1975 and resides in Carlsbad, California.  She worked as an "Account Manager" for Xerox from 1976-1984, worked in a sales capacity for another company from 1987-1988, and returned to her position at Xerox in 1989.  Plaintiff held the position of Account Manager at Xerox until she was placed on disability on December 27, 2002.

Plaintiff was well and relatively healthy until February 1997.  In March 1997 plaintiff complained to her primary physician, Dr. Glenn Del Carmen, that she had developed numbness and achiness in her fingers, often became very thirsty, and had developed a sensitive tongue.  Plaintiff's March 10, 1997 laboratory results indicated a high "anti-Sjögren's" antibody level.  In April 1997 she complained to Dr. Del Carmen of excessive daytime hypersomnolence, "resulting in early retirement to bed after work, waking up fatigue (sic) the next day with a sore right leg."  Dr. Del Carmen opined

---

[1]  In a Pretrial Order, which the Court signed on November 7, 2008 (Doc. No. 23,) the parties admitted to certain facts requiring no proof at trial.  The Court incorporates by reference the facts admitted by the parties and set forth in the Pretrial Order.  The Court's findings of fact are based upon those facts admitted in the Pretrial Order and the evidence presented at trial.

1    he had a "high clinical suspicion for narcolepsy with associated nocturnal mild clonus."  Plaintiff's

2    October 11, 1997 immunology test results were consistent with "S.L.E., Mixed connective tissue

3    disease, Scleroderma, or Sjögren's Syndrome" ("Sjögren's").

4        Dr. Del Carmen referred plaintiff to a rheumatologist, Dr. Arthur Silverman.  On November

5    4, 1997, Dr. Silverman wrote a letter to Dr. Del Carmen summarizing his examination of plaintiff.

6    Dr. Silverman observed plaintiff was "well developed, well nourished, in no apparent distress.  Gait

7    is normal. There are no obvious deformities."  His physical and neurological examination revealed

8    nothing abnormal.  His joint examination revealed "slight tenderness across the PIP joints but no

9    synovial swelling. Good grip and fist bilaterally."  He noted no tenderness and a normal range of

10   motion in her other extremities, spine, hips, knees, ankles and feet.  He diagnosed "possible

11   Sjögren's."  Plaintiff also underwent a November 1997 salivary gland isotope scan.  The results were

12   consistent with Sjögren's.

13       Plaintiff made numerous visits to doctors in 1999 for her persistent symptoms.  Dr. Del Carmen

14   also referred plaintiff to neurologist Dr. Bruce Lasker.  On May 10, 1999, Dr. Lasker wrote a letter

15   to Dr. Del Carmen summarizing plaintiff's complaints and the result of his examination.  Plaintiff

16   complained of fatigue and sleepiness, and told him of her Sjögren's diagnosis.  She described her

17   fatigue as feeling like she had the flu, and said that resting was "not good enough for her."  She stated

18   at times she had to sleep, and took at least 2-3 naps per week during the day.  She stated she usually

19   did not fall asleep uncontrollably, and could "probably fight off" the urge to sleep.  She stated she

20   slept 6-11 hours per night on average, but had only slept 6-7 hours per night on average until about

21   six months previously.  Dr. Lasker's objective findings revealed a "significant tremor" in both of

22   plaintiff's hands.  He noted she was "alert and fully oriented," that she had  "normal [muscle] bulk,

23   tone, strength and reflexes."  Dr. Lasker concluded plaintiff suffered from: 1) Sjögren's; 2) Essential

24   tremor; and 3) "Fatigue and sleepiness."  He recommended plaintiff submit to a sleep study.

25       In April 1999 plaintiff complained to Dr. Del Carmen about increasing fatigue, but Dr. Del

26   Carmen refrained from prescribing therapy until plaintiff submitted to a sleep study.  Dr. Del Carmen

27   also treated plaintiff for rotator cuff tendinitis over three doctor visits between May 18, 1999 and May

28   21, 1999.  On June 11, 1999 plaintiff told Dr. Del Carmen that her shoulder pain was improving with

1   physical therapy, but  that she was experiencing numbness and tingling her elbows and left wrist.

2   Plaintiff submitted to a sleep study on June 16, 1999, conducted by Dr. Larry Ayers.  He

3   concluded plaintiff suffered  mild to moderate excessive sleepiness but that there was  no evidence

4   of sleep onset REM periods to support a diagnosis of narcolepsy.  Dr. Ayers' diagnosed "possible

5   sleep related breathing disorder," "excessive daytime sleepiness," and Sjögren's.

6   On November 15, 1999 plaintiff reported to Dr. Del Carmen that she still required frequent

7   daytime naps to "survive the day's activities."  Dr. Del Carmen diagnosed hypersomnolence and

8   prescribed Effexor.  On December 9, 1999 plaintiff returned to Dr. Del Carmen, reporting no change

9   in her daytime hypersomnolence.  Dr. Carmen weaned plaintiff off Effexor and started her on Ritalin.

10   The record does not indicate whether plaintiff started the Ritalin.

11   On March 14, 2000 plaintiff reported continued shoulder pain to Dr. Del Carmen.  Dr. Del

12   Carmen made an objective finding of mild muscle stiffness, assessed bursitis and tendinitis of

13   plaintiff's shoulders and neck, and prescribed Feldene.  On May 6, 2001 plaintiff visited Dr. Del

14   Carmen to complain of fatigue, and reported psychological stress due to estrangement from her

15   spouse.  He assessed plaintiff as having dsythmia and hypothyroidism, and prescribed Prozac.  On

16   June 11, 2001 she returned to Dr. Del Carmen, reporting fatigue and hypersomnolence.  The doctor

17   concluded plaintiff suffered from fatigue, hypersomnelence, and depression, all possibly contributed

18   to by Sjögren's.  He prescribed Synthyroid (for her thyroid condition) and indicated possible need for

19   a Ritalin trial.  Plaintiff returned for a follow-up visit on July 9, 2001, complaining of fatigue and

20   insomnia.  Dr. Del Carmen noted her "resting tremor," assessed plaintiff suffered insomnia and

21   fatigue, and prescribed Sonata, Celexa, and Synthyroid.

22   On October 14, 2002 plaintiff reported severe fatigue and body pain to her now primary

23   physician, Dr. Daniel Michaels.[2]  She also indicated she had discontinued all her medications in a

24   failed effort to try holistic medicine.  Dr. Michaels assessed fibromyalgia and Sjögren's.  He

25   prescribed Elavil. Plaintiff returned to Dr. Michaels on November 12, 2002 for severe fatigue. She

26   noted her hip pain had lessened but that her muscle aches were unchanged and possibly worse.

27

28   _____

[2]  Dr. Michaels replaced Dr. Del Carmen as plaintiff's primary physician.  Dr. Michaels practiced in the same La Jolla, California office as Dr. Del Carmen.

Plaintiff stated she had difficulty napping during the day, that she typically went to bed between 7 and 9 p.m., and she awoke at 5:45 a.m. during the week and at 9 or 10 a.m. on weekends.

On December 13, 2002 plaintiff visited Dr. Lorraine Ritchings,[3] reporting increased fatigue, myalgias, and headache. Plaintiff told Dr. Ritchings she had difficulty functioning at work and that her fatigue interfered with her job performance. Dr. Ritchings' objective findings included tremors in plaintiff's hands, "4/5" strength in all extremities, tenderness in the muscles of her upper back and cervical spine, and trigger points over her elbows. Dr. Ritchings concluded plaintiff suffered from fibromyalgia and recommended she continue taking Elavil at night. Dr. Ritchings also recommended plaintiff not return to work until December 23, 2002.

On December 27, 2002 plaintiff reported to Dr. Michaels that she "drove off the road" on December 16, 2002 and had not returned to work since that date. Dr. Michaels diagnosed fibromyalgia. He told plaintiff not to work or drive until January 20, 2003. He also increased her dosage of Elavil. As of December 27, 2002 plaintiff began receiving benefits under Xerox's self-insured Long-Term Disability Plan.

Plaintiff visited rheumatology specialist Dr. Scott Carstens, on January 13, 2003. She had previously visited Dr. Carstens in July 2001. Dr. Carstens' report summarized plaintiff's complaints: fatigue that at times forced her to nap at least twice daily; limitations in activities of daily living; no significant house cleaning, cooking, or shopping; and children in the home aged sixteen to twenty-two provided her with assistance. Plaintiff complained she did not enjoy restorative sleep and had no real energy to perform vocational or avocational tasks.

Dr. Carstens' objective findings included significant myalgias corroborated by a physical examination revealing tender points in various regions of plaintiff's body. Dr. Carstens noted the myalgias were more prominent in plaintiff's thighs and calves. He also noted there was no significant synovitis of the joints of the hands, wrists, elbows, shoulders, knees, ankles or feet. His neurological examination revealed no evidence of focal, motor, or sensory deficits. His findings confirmed plaintiff's history of Sjögren's, fibromyalgia, fatigue, depression, and hypothyroidism.

Dr. Carstens opined the duration and permanence of plaintiff's fibromyalgia symptoms

---

[3] Dr. Ritchings practiced in the same office as Drs. Del Carmen and Michaels.

warranted permanent and stationary status, and he opined he expected no change in her symptoms that would accommodate her return to work.  He stated that the Elavil and Provigil would not change her status other than making her "a bit more comfortable" in pursuing basic activities of daily living.  Dr. Carstens noted plaintiff might experience a waxing and waning of symptoms that would cause her to feel better at some times and worse at others.  In a Confidential Physician Statement sent to "SHPS Health International," Dr. Carstens also indicated that plaintiff's degree of disability based on objective findings was "temporary total" and that she was "unable to discharge work in product sales" for at least another 6-8 weeks.  He concluded plaintiff could return to work on March 1, 2003 for 4 hours a day, 5 days per week, and gave no date at which plaintiff could return to work full time.  Dr. Carstens diagnosed myotonial pain, Sjögren's, and tremor, resulting in plaintiff's disability.

Plaintiff visited rheumatologist Dr. Lalitha Ananth, at Xerox's request, on February 23, 2003 to assess treatment and for a determination of continued short term disability.  Plaintiff complained to Dr. Ananth of throbbing and constant pain in the leg and thigh muscles.  She also complained of having suffered headaches for "several years."  Dr. Ananth concluded plaintiff had joint pain in her knees, hands, elbows and hips.  Dr. Ananth diagnosed Sjögren's and fibromyalgia. Dr. Ananth commented that although the laboratory tests indicated symptoms such as decreased secretion of tears associated with Sjögren's, plaintiff's "main illness" appeared to be fibromyalgia and plaintiff's daytime drowsiness probably related to abnormal sleep cycle.  Dr. Ananth opined plaintiff's symptoms could improve with correction of her sleep cycle and adequate physical therapy or exercise.  Dr. Ananth suggested 45 minutes of aerobic exercise with a treadmill, stationary bike, or swimming, along with heat ultrasound and massage.  Dr. Ananth ultimately concluded plaintiff should be on temporary total disability, but was not a candidate for total disability.  She stated plaintiff could return to work on May 25, 2003 for 4 to 6 hours per day, 5 days per week and could return to work full time on July 25, 2003.

On February 24, 2003 plaintiff visited Dr. Michaels for her persistent Sjögren's and fibromyalgia symptoms.  The two discussed Dr. Ananth's recommendation that she begin physical therapy.  On May 7, 2003 plaintiff visited Dr. Michaels and reported worsening fatigue, muscle pain, and dry mouth.  Dr. Michaels again prescribed Elavil.  On June 17, 2003 plaintiff visited Dr. Michaels

for fatigue and muscle pain.  Plaintiff also reported experiencing increasing mental confusion and stated that she had lost her car in a parking lot.  In a Confidential Physician Statement dated July 7 2003, Dr. Michaels reported plaintiff suffered from fatigue and daytime somnolence based on sleep cycle abnormality.  He diagnosed fibromyalgia and recommended more physical therapy.  He concluded plaintiff was temporarily, not permanently, disabled and could return to work on January 1, 2004 for 4 to 6 hours per day, 5 days per week.  He opined she could return to work full time on July 21, 2004.  On July 21, 2003 and October 23, 2003 plaintiff again visited Dr. Michaels due to muscle pain and fatigue.  Dr. Michaels prescribed Lexpro.

On January  4, 2004, the United States Social Security Administration ("SSA") sent a letter to plaintiff notifying her that as a result of her disability, which commenced on December 27, 2002, she would begin receiving disability benefits.  The letter informed plaintiff she would receive $13,186 in back-pay and $1,918 per month beginning in February 2004.

On January 21, 2004 plaintiff returned to Dr. Michaels with complaints of significant continuing fatigue, muscle pain, and disturbed sleep.  On March 18, 2004 she reported complications of fibromyalgia.  Dr. Michaels' chart from that visit stated, "Disabled. Can't work at all.  Too tired, unfocused, muscle pain."  In a Confidential Physician Statement dated August 16, 2004, Dr. Michaels stated his objective findings supporting plaintiff's inability to work were muscle weakness, positive Sjögren's lab work and Dr. Carstens' "rheumatology note."  At that time Dr. Michaels concluded plaintiff was temporarily and permanently disabled as a result of his diagnosis of Sjögren's.  He nevertheless stated plaintiff could return to work on September 1, 2004 for one half hour per day, three days per week and could return to work full time on September 1, 2005.  He listed her physical limitations as "can't drive more than 15 minutes; can't walk or sit for more than 15 minutes; must nap every 4 hours" and noted that use of a cane helped plaintiff's left leg pain.  Based on his objective findings, Dr. Michaels concluded plaintiff was "unable to work; unable to cook or clean home." Plaintiff attended follow-up visits with Dr. Michaels on September 1, 2004 and December 4, 2004 for her complaints of ongoing fatigue, muscle pain, and joint pain.  Dr. Michaels assessed Sjögren's, chronic fatigue, and fibromyalgia.

On April 25, 2005 plaintiff attended a rheumatology consultation at Kaiser Permanente with

Dr. Rachel Kim for complaints related to Sjögren's.  Plaintiff's musculoskeletal examination indicated "no peripheral synovitis."  Dr Kim noted plaintiff's "joints are nontender and move well through their range of motion, including both hips."  The neurological examination revealed intact motor strength throughout.  Dr. Kim did not opine on plaintiff's ability to work or her fibromyalgia diagnosis.

On March 29, 2005 Xerox notified plaintiff her benefit payments under the self-insured long-term disability plan would end on on May 30, 2005.  The letter also stated that because plaintiff had elected to receive "Extended Disability" coverage, she would be eligible for those disability benefits if she met the plan's definition of "Total Disability."

Prudential Group Policy DG-3100 states:

> "Total Disability" exists when Prudential determines that all of these conditions are met:
>
> (1) Due to Sickness of accidental injury, you are not able to perform, for wage or profit, the material and substantial duties of any gainful occupation for which you are reasonably fitted by your education, training, or experience, or other work which the Employer has made available to you.
>
> (2) You are not working at any job for wage or profit.  This does not apply to a job with another employer which began prior to your Total Disability.
>
> (3) You are under the regular care of a Doctor.
>
> For the purposes of Total Disability, a gainful occupation means an occupation that is or can be expected to provide you with an income of at least equal to 60% of your Indexed Pre-Disability Earnings.

Based upon a monthly income of $6,212.13 ($74,545.56 annually), Prudential concluded plaintiff's monthly long term disability benefit to be $4,348.49.  However, Prudential adjusted the monthly benefit to $2,470.49.[4]

Despite initially granting plaintiff's claim, Prudential continued to investigate the nature of her disability.  On May 26, 2005 Registered Nurse Mary Ann DeSantis noted in Prudential's file that "[c]laimant may be able to perform seated work for 8 hours a day, but given symptoms associated with Sjögren's and length of time claimant has been treating for musculoskeletal pain, functionality is difficult to establish without direct observation of claimant."  The note also states "claimant took

---

[4]  The adjusted monthly benefit is equal to the monthly long term benefit, less plaintiff's monthly social security benefit, which Prudential stated as $1,878.00.

prednisone in past [without] relief of pain, and therefore perceived pain may be due to [fibromyalgia], not Sjögren's." The Prudential file further states that plaintiffs full-time return to work, estimated for September 1, 2005 by Dr. Michaels was "not likely, given the length of [treatment for claimant's] chronic pain."

On May 27, 2005, Lorena Eaton ("Eaton"), a Prudential Disability Consultant, noted in Prudential's file that "it is unclear whether [employee's] complaints of pain are due to Fibro or are credible from a Sjogren's standpoint." Ms. Eaton arranged for plaintiff to submit to an independent medical examination ("IME") with internist and rheumatologist Dr. C.V. Mehta on August 29, 2005. Ms. Eaton requested that the independent medical examiner conduct a review of plaintiff's medical history and current activities and perform a detailed physical examination to note any objective signs of muscle weakness, mobility impairments and other physical indicators. Ms. Eaton directed that the examiner should observe whether plaintiff drove to the appointment and should make "functional status assessments" of impairments in plaintiff's communication, cognition, pain and mobility. Finally, Ms. Eaton requested that the examiner opine, based upon all these factors, whether plaintiff was capable of performing "real-world employment activity."

A private investigator from Research Consultants Group, Inc. ("RCG") also conducted a preliminary investigation of plaintiff on Prudential's behalf. The investigator's report, dated July 31, 2005, states an internet search revealed plaintiff participated in the 2002 "Carlsbad 5000" recreational walk but revealed no further participation in these types of events. The report also states plaintiff's neighbors believed she was not employed although "one individual" thought plaintiff was running a business from her home. Prudential could not corroborate this assertion, after checking records of the California Secretary of State's office and plaintiff's 2004 and 2005 income tax returns. The report additionally states plaintiff was a member of a 24-Hour Fitness club near Carlsbad, California.

An investigator from RCG conducted surveillance of plaintiff on August 28, 29, and 30, 2005. His findings are detailed in a report dated September 12, 2005. The report states that on Sunday August 28, 2005 plaintiff was observed driving away from her residence, but the investigator lost plaintiff in traffic and did not observe her further that day. The investigator notes that on Monday August 29, 2005 plaintiff's car was not outside her residence at 5:58 a.m. He observed plaintiff

1    arriving at her residence at 7:00 a.m.  At 8:26 a.m., a taxi arrived to take plaintiff to her IME in Hemet,

2    California, approximately 66 miles from plaintiff's residence in Carlsbad.  Plaintiff entered Dr.

3    Mehta's office at 10:01 a.m.  At 11:45 a.m., after her appointment, she traveled by taxi to her

4    residence. The investigator noted plaintiff walked inside with a "slight limp."  He terminated

5    surveillance two and a half hours later when plaintiff did not exit her house.

6         On Tuesday August 30, 2005, the investigator observed plaintiff leaving the residence in her

7    vehicle and driving to 24 Hour Fitness.  Plaintiff walked into the gym at 8:16 a.m., and the investigator

8    observed plaintiff inside the gym riding an exercise bicycle at 8:55 a.m.  Plaintiff left the gym at 9:02

9    a.m. and drove back to her residence.  At 10:23 a.m., the investigator observed plaintiff driving to an

10   office building in Del Mar, California, approximately 13 miles away.  Plaintiff entered the building

11   and exited at 1:30 p.m., carrying towels to her car.  Plaintiff walked back to the office building and

12   walked out to the parking garage again with an unknown male, who then entered his car.  She

13   followed the man's car in her own vehicle to a strip mall where they entered a store together.  They

14   departed minutes later, following one another in their vehicles for approximately 8 miles to a residence

15   in Encinitas, California.  The investigator observed plaintiff exiting her own car, entering the male's

16   car and driving it to a car wash. Upon returning from the car wash, he observed plaintiff walking back

17   to her car with the male, carrying a jug of water weighing approximately one gallon.  Plaintiff left at

18   2:43 p.m., arriving home at 2:57 p.m.  Upon returning to her residence, the investigator observed

19   plaintiff exiting her car carrying a towel and removing mail from her mailbox before walking inside

20   the house.         Dr. Mehta also prepared a report at Prudential's reuest, dated August 29, 2005.  In his

21   report, Dr. Mehta states he reviewed the medical records from Drs. Michaels, Del Carmen, and

22   Ananth.  The report notes that plaintiff experienced "periods of confusion," and felt "unsafe driving"

23   in addition to "muscle achiness, dryness of the eyes and mouth, lack of concentration, and increased

24   sleepiness."  Upon conducting a physical examination of plaintiff. Dr. Mehta observed:

25              The patient appeared confused at times and sleepy and drowsy during
              the interview where the patient could not adequately concentrate
26              whenever the patient was confronted and questions were asked. . . . She
              had changes of Raynaud's in the hands but not in the feet.  The joint
27              examination revealed no active synovitis, tenderness, redness, warmth,
              or deformities of any joints of the upper or lower extremities. . . .
28              There was no promximal or distal muscle weakness or tenderness.
              There was no atrophy[,] . . .digital scarring[,]. . .skin tightness[, or] . .

.peripheral rash.   The spinal examination revealed suboccipital tenderness, mid trapezial tenderness and mid scapular tenderness. There was tenderness over the lower lumbar spine and over the sacroiliac joints as well as over the greater trochanters, medial knees, and medial elbows although the range of motion at the spine was unrestricted.

In his report, Dr. Mehta states: "[plaintiff] does have Sjögren['s] syndrome and fibromyalgia with a lack of concentration and episodes of increased somnolence.  I feel the patient is totally disabled and would not be able to do any kind of job that requires any kind of concentration, driving, prolonged sitting, prolonged standing or lifting."

In a Prudential file note dated November 10, 2005, Ms. Eaton requests a supplemental report from Dr. Mehta to allow him to revisit his conclusions after considering the results of Prudential's surveillance.  Ms. Eaton's note states  Prudential needed the addendum because Dr. Mehta's conclusion was "based in part on [employee's] self-reported symptoms of fatigue and pain," and because Dr. Mehta's physical examination findings were "within normal limits."  Ms. Eaton's note suggests plaintiff's sleepiness during the IME could be attributable to the early morning gym visit before her appointment.  The note also states Dr. Mehta refused to perform the additional review.  Ms. Eaton's note concludes that in light of Dr. Mehta's refusal it was appropriate to refer plaintiff's claim to a rheumatologist for a file review.

Dr. Robert MacBride, Prudential's internal Medical Director added a note to the Prudential file on December 6, 2005.  The note summarizes his review of plaintiff's medical records from March 1997 through August 2005.  In the note, Dr. MacBride opines Dr. Mehta's IME was "superficial" and took "at face value the presence of diagnoses and self-report as being evidence of loss of work capacity."  Dr. MacBride states that although plaintiff insisted she had lost all work capacity, she displayed "activity/function which is inconsistent with that position" while under surveillance.  Dr. Mac Bride concludes that "with reasonable medical certainty, from the records available for review, I do not see evidence of significant impairment with loss of work capacity throughout the duration of this claim."

On December 8, 2005 Ms. Eaton wrote to Reed Review Services to confirm an independent file review of plaintiff's records.  Ms. Eaton stated Prudential was "currently evaluating her physical ability to perform 'any' occupation effective May 30, 2005 and ongoing to the present."  Ms. Eaton

- 11 -

1   presented a series of questions to be answered by the reviewer regarding plaintiff's functional

2   impairments.  Ms. Eaton also requested an opinion on whether Dr. Mehta's IME findings were

3   "supported' by his physical examination of plaintiff  and by the surveillance.

4        Dr. Tanya Lumpkins, a rheumatologist, performed the independent file review for Prudential.

5   Dr. Lumpkins reviewed the internal Prudential file notes, Dr. Mehta's IME report, and the surveillance

6   video.  She also reviewed the medical records of plaintiff's treating physicians, with the exception of

7   Dr. Ayers' sleep study.  In her report, dated December 27, 2005, Dr. Lumpkins states the objective

8   data supported plaintiff's diagnoses of Sjögren's and fibromyalgia.  She acknowledges "[t]he

9   diagnosis [sic] of [Sjögren's]  and fibromyalgia can both be associated with fatigue.  The treatment

10  includes lifestyle modifications and to increase aerobic conditioning."  However, the severity of

11  plaintiff's complaints of pain, cognitive impairment, and fatigue were self-reported and not supported

12  by objective data beyond the self-reports.  She similarly opines the IME appeared to be based upon

13  subjective complaints, in addition to Dr. Mehta's perception of plaintiff's fatigue.  Dr. Lumpkins

14  concludes plaintiff's subjective complaints are not overly severe because of plaintiff's ability to drive.

15  Dr. Lumpkins relied on the surveillance video in concluding plaintiff could  walk, exercise, bend and

16  carry objects of at least 10 pounds, which are "more than associated with sedentary level work."  Dr.

17  Lumpkins states: "the medical data submitted fails to document a  rhuematological diagnosis of

18  sufficient severity to impair the claimant from performing sedentary work."

19       In December 2005, Prudential's Vocational Rehabilitation group also performed an

20  employability assessment on plaintiff.  Gregg Schwartzkopf, a Prudential Vocational Rehabilitation

21  Specialist, entered a note in Prudential's file dated December 27, 2005 summarizing his review of

22  plaintiff's file.  He considered plaintiff's age, her affliction with "sicca syndrome," and the restriction

23  that plaintiff could only "lift to 10 pounds occasionally."  Plaintiff's transferable skills were "dealing

24  with people" and "making independent judgments."  The assessment concludes plaintiff could

25  reasonably be employed as a telephone solicitor (at $14.29 per hour), a "supervisor, order takers" (at

26  $26.32 per hour),  or a "job development specialist" (at $21.73 per hour).

27       On December 27, 2005, Ms. Eaton notified plaintiff by letter that her benefits would be

28  terminated on January 1, 2006, but that Prudential would extend benefits through January 31, 2006

1   to facilitate plaintiff's transition back to work.  The letter explains Prudential ultimately determined

2   plaintiff was capable of performing sedentary work from a physical standpoint.  The letter also states

3   that within plaintiff's sedentary work capacity Prudential had identified gainful employment for which

4   plaintiff qualified based on her education, training, and work history consisting of: (1) Supervisor,

5   Order Takers (at $26.32 per hour); and (2) Job Development Specialist (at $ 21.73 per hour).

6        On May 26, 2006 plaintiff formally appealed Prudential's denial of her benefits.  Plaintiff

7   submitted the report of Mark Remas, a vocational consultant, with her appeal letter.  In Mr. Remas'

8   report, dated May 2, 2006, he assesses plaintiff's ability to compete for employment in the general

9   labor market, and her earning capacity in comparison with her annual income with Xerox.    Mr.

10  Remas' report attaches an inventory of physical, cognitive, and professional skills that plaintiff

11  possessed before her disability, compared with her corresponding skill levels post-disability.

12  Generally, the new skills profile corresponded to sedentary work, as opposed to the "medium" work

13  level plaintiff performed before her disability.  Also, Mr. Remas increased plaintiff's ability for

14  "reaching, handling, fingering, and feeling" from "occasional" to "frequently."  Based on his analysis,

15  Mr. Remas concludes plaintiff's transferable skills do not qualify her for either of the positions

16  suggested by Prudential's denial letter.  Mr. Remas only identifies one sedentary-level job category

17  to which plaintiff's transferable skills are applicable: "Telephone Solicitor," a semi-skilled position

18  with a 2005 mean annual wage of $26, 827.00.  Notwithstanding this finding, Mr. Remas ultimately

19  concludes plaintiff's significant physical and cognitive limitations preclude her from competitive

20  employment in the open labor market because her symptoms will cause frequent periods of

21  absenteeism.  He explains plaintiff is not able to work full-time with continuity and has no realistic

22  ability to earn 60% of her Indexed Pre-Disability Earnings[5] in an alternate occupation commensurate

23  with her education, training and experience.

24       In response to the appeal, Prudential partially  re-assessed its prior vocational review and

25  retained vocational rehabilitation consultant Carole Niemietz to research specific occupations within

26

27          [5] Mr. Remas' calculation is based on plaintiff's report that her annual income was $92,000,
    based on her five-year average income as calculated by Xerox.  60 % of that figure is $55,200.  Mr.
28  Remas' conclusion is based on the fact that a Telephone Solicitor's salary, $26,827, is far less than
    $55,200.  Prudential has disputed that plaintiff's pre-disability salary was $92,000.  Mr. Remas
    adopted Prudential's salary figure in his supplemental report.  The report is discussed *infra*.

a fifty mile radius of Carlsbad, California.  Prudential requested that Ms. Niemietz research sales positions and  "Order Taker Supervisor" positions.  Prudential furnished Ms. Niemietz with information that plaintiff had graduated from Northwestern University in 1975, her work history, and a 1 page "Executive Job Profile" outlining duties and responsibilities of an Account Manager with Xerox. Prudential did not provide the counselor with plaintiff's resume, work history form, vocational interview report, or any medical information. On July 26, 2006. Ms. Niemietz reported she found job openings through online job search sources, and completed twenty-one employer interviews.  The positions were open and full-time as of July 14-25, 2006.

On September 14, 2006 Dr. Paul Howard, a rheumatologist, conducted an independent peer review of plaintiff's file for Prudential.  Dr. Howard states that from a rheumatological perspective as of January 2006, there were "no findings consistent with any degree of functional impairment" despite "documented trigger point tenderness by multiple observers consistent with that of fibromyalgia." Dr. Howard concludes plaintiff showed "no evidence of any motor weakness, loss of coordination or tone."  He states that trigger point tenderness in and of itself is not an impairing condition.  He also concludes plaintiff showed no significant problem with concentration, daytime sleepiness or depression based on medical reports, and observed her "lack significant worries" about driving in the surveillance video. On November 6, 2006 Dr. Howard supplemented his report but did not alter the assessment of his original report.

On November 13, 2006, Prudential Senior Appeals Analyst Susan Gatti ("Gatti") sent plaintiff a letter denying her appeal  because the occupations of "Inside and Outside Sales Representative" and "Order Taker Supervisor" are gainful and compatible with plaintiff's training, education, experience, and physical abilities.  Ms. Gatti explains these occupations exist in the general labor market in a sedentary to light work capacity and varied in salary for the first year between $40,000 and $58,000 plus commission. Ms. Gatti also explains these salaries are "gainful" because plaintiff's pre-disability income was $ 74, 545.56 per year, 60% of which was $ 44,727.34 per year.

Plaintiff requested reconsideration of her claim on March 7, 2007.  She attached a supplemental report, dated February 21, 2007 from Mr. Remas.  Mr. Remas adopts Prudential's pre-disability income figure of $74,545.56 per year, but refutes every finding in the Labor Market

Survey based on availability or salary. Ultimately, Mr. Remas again concludes plaintiff cannot replace 60% of her pre-disability income. On March 30, 2007 Ms. Gatti sent a letter to plaintiff denying her second request for reconsideration and stating that the decision was final.

Plaintiff requested a third reconsideration of Prudential's decision on April 3, 2007. On April 12, 2007 Prudential denied plaintiff's request to submit to a new IME. Plaintiff attempted twice more, on April 20, 2007 and May 17, 2007, to persuade Prudential to reconsider and allow her to undergo another IME. These requests were unsuccessful. Plaintiff thereafter filed the present complaint.

Section 502(a) of ERISA, provides that: "A civil action may be brought– (1) by a participant or beneficiary . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. . . ." 29 U.S.C. § 1132(a) (2009). A denial of benefits challenged under § 1132(a)(1)(B) is reviewed under a *de novo* standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); see also Ingram v. Martin Marietta Long Term Disability Income Plan, 244 F.3d 1109, 1112 (9th Cir. 2001). The parties do not dispute that the Policy does not give the administrator such discretion. Accordingly, the Court reviews Prudential's decision *de novo*. On *de novo* review, the Court must determine whether Plaintiff is disabled within the terms of the Policy on the record that the administrator had before it. Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc).

Plaintiff bears the burden of proving she was disabled within the terms of the Policy. Weil v. Fed. Kemper Life Assurance Co., 7 Cal. 4th 125, 27 (Cal. 1994); Padfield v. AIG Life Ins. Co., 290 F.3d 1121, 1125 (9th Cir. 2002), cert. denied, 537 U.S. 1067 (2002) (courts interpreting ERISA policies may borrow from state law where appropriate). To meet her burden in this case, plaintiff must show that: (1) Due to Sickness or accidental injury, (2) she is not able to perform, for wage or profit, the material and substantial duties of any gainful occupation for which she is reasonably fitted by her education, training, or experience, (3) she is not working at any job for wage or profit, and (4) she is under the regular care of a doctor. The parties do not dispute that plaintiff is currently not working at any job for wage or profit, or that she is under the regular care of a doctor. The Court therefore

07cv1276

1    addresses the sufficiency of plaintiff's showing regarding the first two elements of her burden.

2           The Policy's defines "Sickness" as: "Any disorder of the body or mind of a Covered Person,

3    but not an injury. . . ."  Plaintiff has proven she suffers from Sjögren's, fibromyalgia, and increased

4    somnolence.   The parties do not dispute that plaintiff suffers from fibromyalgia, but do dispute that

5    her condition functionally impairs her from working.  In order for Plaintiff to prove she qualifies for

6    total disability under the Policy, plaintiff must also show she is not able to perform, for wage or profit,

7    the material and substantial duties of any gainful[6] occupation for which she is reasonably fitted by her

8    education, training, or experience.  The weight of the evidence supports a finding that plaintiff cannot

9    perform even sedentary work.

10          Due to fibromyalgia, plaintiff has experienced excessive daytime sleepiness, fatigue,

11   headaches, joint pains, mental confusion, lack of mental focus, difficulty sitting or walking for longer

12   than fifteen minutes, and muscle aches and pains, especially in her leg and thigh muscles.  Plaintiff's

13   complaints of fatigue and pain began over twelve years ago, predating the fibromyalgia diagnosis.

14   Plaintiff has reported that in addition to sleeping eleven hours per night she needs up to two naps per

15   day as a result of her symptoms.  She has also indicated she is limited in activities of daily living such

16   as house cleaning, cooking, shopping, and driving for longer than fifteen minutes.

17          Drs. Carstens and Mehta both have had the opportunity to examine plaintiff, and both are

18   rheumatologists, the appropriate medical specialty for assessing fibromyalgia.   In his January 13,

19   2003 report, Dr. Carstens found plaintiff's symptoms warranted "permanent and stationary" status, and

20   stated he expected no change in plaintiff's symptoms that would accommodate her return to work.

21   His report states plaintiff will experience a waxing and waning of symptoms that will cause her to feel

22   better at times and worse at others.  In addition, Dr. Carstens made objective findings of "significant

23   myalgias" evidenced by tender points in various areas of plaintiff's body ("occipital regions,

24   supraspinatus, levator scapula, anterior chest, trochanteric region, gluteal region, medial knee and

25   _____

26          [6]  The Policy reads, "[f]or the purposes of Total Disability, a gainful occupation means an
     occupation that is or can be expected to provide you with an income of at least equal to 60% of your
27   Indexed Pre-Disability Earnings." (PRU 0029.)  The Court finds that plaintiff's indexed pre-disability
     earnings were $ 74,545.56 annually.  Sixty percent of plaintiff's indexed pre-disability income is
28   $ 44,727.34 annually, or $ 3, 727.29 monthly.  Plaintiff is therefore totally disabled if she is not able
     to perform the duties of an occupation that pays her $44, 727.34 annually and is reasonably fitted by
     her education, training, or experience.

1    lateral elbow.") Dr. Carstens' report is a thorough and detailed explanation of his findings.

2         Dr. Mehta, the independent rheumatologist retained by Prudential, determined in August 2005

3    that plaintiff was "totally disabled and would not be able to do any kind of job that requires any kind

4    of concentration, driving, prolonged sitting, prolonged standing or lifting."  Dr. Mehta provided a

5    thorough and detailed report of his findings.  In addition to plaintiff's subjective complaints, Dr. Mehta

6    observed plaintiff's  fatigue and confusion, and found tender points in a physical examination.  Dr.

7    Mehta unequivocally concluded plaintiff is unable to work, even in a sedentary position.

8         Although a court may not automatically accord special deference to a treating physician's

9    opinion when reviewing a disputed ERISA claim, Black & Decker Disability Plan v. Nord, 538 U.S.

10   822, 825 (2003),[7] a court also "may not arbitrarily refuse to credit a claimant's reliable evidence,

11   including the opinions of a treating physician." Id. at 834.  Dr. Carstens' opinion merits considerable

12   weight because he is a specialist in the relevant field who was thoroughly  familiar with plaintiff's

13   condition. Moreover, Dr. Mehta, a rheumatologist retained by Prudential, and who had no "incentive"

14   for finding plaintiff was not disabled, corroborates Dr. Carstens' opinion.[8]

15        Although  Dr. Ananth, the rheumatologist Xerox retained to examine plaintiff, determined in

16   February 2003 that plaintiff suffered from fibromyalgia, but she was "not a candidate for total

17   disability," this conclusion is outweighed by the findings of the two other rheumatologists who

18   performed examinations of plaintiff that were not materially different from that of Dr. Ananth.

19        Drs. MacBride, Lumpkins, and Howard concluded that plaintiff's fibromyalgia does not

20   functionally impair her from working.  However, these opinions are based solely on their review of

21   plaintiff's file, and not a personal examination of plaintiff.  Accordingly, the Court declines to give

22   their opinions the same weight as the opinions of Drs. Carstens and Mehta. Jebian v. Hewlett-Packard

23   _____

24        [7]  "Under a rule adopted by the Commissioner of Social Security, in determining whether a
     claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the
25   claimant's treating physician. . . ." Nord, 538 U.S. at 825.  The Nord Court decided that the automatic
     deference mandated by this "treating physician rule" was not applicable to ERISA disability
26   determinations. Id.

27        [8]  In discussing the applicability of the "treating physician rule" to ERISA cases, the Nord
     Court noted that "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not
28   disabled,' so a treating physician, in a close case, may favor a finding of "disabled." Nord, 538 U.S.
     at 832.

Co. Employee Benefits Organization Income Protection Plan, 349 F.3d 1098, 1109 n. 8 (9th Cir. 2003) (citing Nord, 538 U.S. at 832) (stating a court may recognize "that a given treating physician has 'a greater opportunity to know and observe the patient' than a physician retained by the plan administrator.")  See also Kearney, 175 F.3d at 1095 (stating a court "can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.")

Drs. MacBride and Lumpkins criticized Dr. Mehta's conclusions as improperly based on "self-report" with inadequate objective findings.  However, an administrator may not exclude a claim for lack of objective medical evidence unless that standard was made "clear, plain and conspicuous enough [in the policy] to negate layman [plaintiff's] objectively reasonable expectations of coverage." Saltarelli v. Bob Baker Group Medical Trust et al., 35 F.3d 382, 387 (9th Cir. 1994);  see also May v. Metro. Life Ins. Co., 2004 U.S. Dist. LEXIS 18486, *26 (N.D. Cal. Sept. 9, 2004) ("MetLife abused its discretion by requiring that Plaintiff meet an additional requirement for eligibility beyond those imposed by the Plan.") Furthermore, as the Ninth Circuit has explained, fibromyalgia is based on symptoms that are "entirely subjective."[9]  Prudential may not deny plaintiff's claim because Drs. Carstens and Mehta could not provide objective proof beyond "tender points" where such proof is not available.  See Duncan v. Continental Cas. Co., 1997 U.S. Dist. LEXIS 1582, *15-17 (N.D. Cal. Feb. 10, 1997) (finding an insurer improperly denied the claim of the plaintiff, who had fibromyalgia, due to a lack of "objective medical evidence" to support her disability claim).

The video surveillance upon which Prudential also relies is not inconsistent with the levels of activity considered by plaintiff's doctors.  The surveillance reveals plaintiff with a noticeable limp on the days she was followed, which is consistent with her complaints of difficulty walking.  Although the surveillance video also shows plaintiff driving (a fact used by Drs. Lumpkins and Howard to negate plaintiff's complaints about the daytime sleepiness, lack of concentration, and fear of driving), plaintiff's medical records only indicate that she could not drive for more 15 minutes at a time.  The observations of plaintiff riding an exercise bicycle in the gym are also not inconsistent with Dr.

---

[9] "[F]ibromyalgia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.  There are no laboratory tests for the presence or severity of fibromyalgia."  Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 872  (9th Cir. 2004).

1   Carstens' conclusion that plaintiff would experience a waxing and waning of symptoms causing her

2   to feel better at times and worse at others.

3          Prudential relies on Ms. Niemietz's Labor Market Survey in denying plaintiff's first and

4   second appeals.  Ms. Niemietz's report indicates several Carlsbad-area employers were searching for

5   both salespeople and "supervisor, order takers" who expressed interest in plaintiff's credentials.  Upon

6   review of Ms. Niemetz's report, the Court finds that it is deficient in that Ms. Niemetz did not consider

7   any of plaintiff's medical information in her analysis.  Ms. Niemetz only took into consideration

8   plaintiff's age, education, and work history.  Although Ms. Niemetz inquired about the physical

9   demands of each job she researched, she knew nothing about plaintiff's condition.  Having determined

10  that plaintiff is indeed severely limited by fibromyalgia, the Court concludes that none of the positions

11  identified in the Labor Market Survey Report are viable work options for plaintiff.

12         After considering all the evidence presented at trial, the Court finds by a preponderance of

13  evidence plaintiff is not capable of performing her job at Xerox, and she is not capable of performing,

14  for wage or profit, the material and substantial duties of any gainful occupation for which she is

15  reasonably fitted by her education, training, or experience.  Moreover, plaintiff is permanently

16  incapable of performing any job at any exertional level.  The Court accordingly finds plaintiff has met

17  her burden of proving she is totally disabled under the Policy.[10]

18         The Court finds plaintiff is entitled to recover the long-term disability benefits withheld up to

19  the date of this judgment.  The record reflects: (1) when Prudential terminated plaintiff's benefits she

20  was receiving $4,348.49 per month, less an offset of her social security benefits; and (2) in 2005

21  plaintiff received $1969.12 per month in social security benefits.  The Court accordingly finds plaintiff

22  is entitled to long-term disability benefits in the amount of $2,379.37 per month from February 1, 2006

23  until March 31, 2009.  Therefore, plaintiff shall recover past benefits in the amount of $90,416.06.

24         The Court has also balanced the equities in this case, and finds plaintiff is entitled to

25

26         [10]   The Court also finds its conclusion is supported by the finding of the Social Security
    Administration that plaintiff is disabled under its standards.  Although the Social Security
27  Administrations' determination that plaintiff is disabled under the Social Security Act is not binding
    on insurers or courts reviewing ERISA claims, it is relevant to the issue of whether plaintiff is
28  disabled under the Policy.  Wible v. Aetna Life Ins. Co., 375 F. Supp. 2d 956, 971 (C.D. Cal. 2005)
    (citing Kirwan v. Marriott Corp., 10 F.3d 784, 790 n. 32 (11th Cir. 1994)); see also Riedl v. General
    American Life Ins. Co., 248 F.3d 753, 759 n. 4 (8th Cir. 2001).

prejudgment interest.  See Wessel v. Buhler, 437 F.2d 279, 284 (9th Cir. 1971); Cherry v. Digital Equip. Corp. Long-Term Disability Plan, 2006 U.S. Dist. LEXIS 68099, at *30 (E.D. Cal. Aug. 10, 2006) (finding an award of prejudgment interest appropriate, *inter alia*, to fully compensate the plaintiff for her injuries after being wrongfully denied benefits for a year and a half).  Plaintiff requests the Court award prejudgment interest at ten percent annually, but fails to provide any argument to support the application of that rate.  As such, the Court awards plaintiff prejudgment interest at the rate provided in 28 U.S.C. § 1961(a).  Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1164 (9th Cir. 2001) ("We have held that the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest [in an ERISA case] unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate.")  The interest rate should be determined individually for each disability benefit payment that plaintiff was denied, based on the rate at the time that each benefit became due.  See Fleming v. Kemper Nat'l Servs., 373 F. Supp. 2d 1000, 1013 (N.D. Cal. 2005) (citing Nelson v. EG & G Energy Measurements Group, 37 F.3d 1384, 1391-1392 (9th Cir. Cal. 1994)).

### CONCLUSION

In conclusion, judgment is entered in favor of plaintiff.  Plaintiff shall recover $90,416.06 for past benefits from February 1, 2006 to March 31, 2009 plus prejudgment interest at the rate applicable to each benefit payment pursuant to 28 U.S.C. § 1961(a).  The Court further orders that: (1) plaintiff shall file her request for attorney's fees and costs pursuant to Fed. R. Civ. P. 54(d) and Civil Local Rule 54.1; (2) Prudential shall reinstate plaintiff under the Policy, effective January 1, 2006.  The parties' rights and duties are reinstated consistent with the terms and conditions of the Policy; and (3) The Clerk of the Court shall enter judgment consistent with this order.

**IT IS SO ORDERED.**

**DATED:  March 24, 2009**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

07cv1276